## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 08 2019, 9:15 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cristin L. Just
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Erik J. Bryant
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ryan Lovely,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

May 8, 2019

Court of Appeals Case No.
18A-CR-2776

Appeal from the Jasper Circuit
Court

The Honorable John D. Potter,
Judge

Trial Court Cause No.
37C01-1802-F4-169

**Brown, Judge.**

[1] Ryan Lovely appeals his conviction and sentence for burglary as a level 4 felony. He raises two issues which we revise and restate as:

> I. Whether the evidence is sufficient to sustain his burglary conviction as a level 4 felony; and

> II. Whether his sentence is inappropriate in light of the nature of the offense and his character.

We affirm.

### Facts and Procedural History

[2] On February 25, 2018, Lovely burglarized a house in Gifford, Indiana. J.N. Garner Wireman, Jr., ("Garner") and Danielle Wireman ("Danielle"), who were at their home in Pendleton, Indiana, received a notification from their security system service, and video showed an individual in the living room of their house in Gifford. The police later arrested Lovely. On February 28, 2018, the State charged him with Count I, burglary as a level 4 felony; Count II, residential entry as a level 6 felony; and Count III, theft as a class A misdemeanor.

[3] At the jury trial, Garner testified that he and his wife Danielle had inherited the house in Gifford from his father, who had passed away in August 2017. When asked how he used the house in Gifford, he testified "[w]e were using as a weekend getaway when we get there for the weekends somehow. There's quite a bit of work that needs to be done, so we're still working on it as well." Transcript Volume 2 at 77. He testified "[w]e usually would stay Friday,

Saturday and leave Sunday," he was able to cook there, there was a working stove and refrigerator, they did laundry, and there was electricity and running water. *Id*. When asked "since you inherited that house, how long would you say that you would stay there? How often," he replied "[w]e would try to go at least once a month, sometimes twice a month, depending on what we wanted to do." *Id*. He indicated that he lived with his father and took care of him during the last month of his life and that he had visited him quite often. When asked how long his father had lived there, he testified "[w]e, as a family, moved there in 1984 and he'd lived there since then." *Id*. When asked how many times he had been to the house after he inherited it and before the burglary, he replied "I'd say maybe a dozen times." *Id*. at 84. He indicated that his father had collected quite a bit and was a pack rat by nature, that he was trying to sort through things and was not familiar with every piece of property his father owned at the time he passed away, and that he was still deciding what to keep. When asked the last time he visited the house prior to the burglary, he stated he had been there in January to check on things and make sure the furnace was running.

[4] Danielle indicated her primary residence was in Pendleton and her secondary residence was in Gifford. She testified that the house in Gifford was "kinda like a second home for us. We try to go up once a month, or twice a month and spend the weekend there." *Id*. at 97. She testified that Garner's daughter, who was twenty-three, used the property and, when asked how often his daughter used the property, she replied "[p]robably about once a month as well. When

she's not there with us, she has her grandparents in the area, so she does goes up there and check on the house." *Id.* When asked why they installed the security cameras, she testified "[w]e knew that the house was going to be empty most of the time, except for when we were there, so we wanted to be able to look over the property when we weren't there." *Id.* at 98. The jury found him guilty as charged. The court entered judgments of conviction on Counts I and III and sentenced Lovely to concurrent terms of 3,650 days on Count I and 360 days on Count III.

## *Discussion*

### I.

[5] The first issue is whether the evidence is sufficient to sustain Lovely's conviction for burglary as a level 4 felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied*. We look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* The conviction will be affirmed if there exists evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.*

[6] Lovely asserts that the structure he burglarized was not a dwelling and the evidence does not support his conviction for burglary as a level 4 felony. He argues the owner of the home had died almost seven months prior to the reported burglary, there is no indication that the Wireman family enjoyed

family activities or vacations at the house, Garner had not been to the house since mid-January, and Danielle stated the reason the security cameras were installed was because the house would be empty most of the time. He argues that, based on the infrequent visits and the lack of personal knowledge of details regarding the state of the house, it is reasonable to conclude that the house remained vacant due to the death of the homeowner and his children had not yet decided what they were going to do with the property. The State maintains the jury could reasonably conclude the residence was a dwelling for purposes of the burglary statute, that Garner's father lived at the residence for thirty-four years until his death, and the residence did not lose its status as a dwelling.

[7] Ind. Code § 35-43-2-1 provides that a person who breaks and enters the building or structure of another person, with intent to commit a felony or theft in it, commits burglary, a level 5 felony. The statute further provides that the offense is a level 4 felony if the building or structure is a dwelling. Ind. Code § 35-31.5-2-107 provides: "'Dwelling' means a building, structure, or other enclosed space, permanent or temporary, movable or fixed, that is a person's home or place of lodging." "[B]urglary of a dwelling is not so much an offense against property as it is an offense against the sanctity and security of habitation. To that end, the legislature has provided an increased penalty for burglarizing a dwelling because of the potential danger to the probable occupants." *Howell v. State*, 53 N.E.3d 546, 549 (Ind. Ct. App. 2016) (citations and internal quotation marks omitted), *trans. denied*.

[8] In *Howell*, the defendant burglarized a house hours after the sole occupant of the house had been found dead inside. 53 N.E.3d at 547. We observed that it is well established that, if a house is left empty temporarily by its occupant, the house does not lose its status as a dwelling if the occupant intends to return. 53 N.E.3d at 549-550 (citing *Hayden v. State*, 19 N.E.3d 831, 837 (Ind. Ct. App. 2014) (holding that a house was a dwelling where the previous occupant Ronald had not lived in the house for approximately one year before the defendant's offense and was living in a nursing home, all of Ronald's personal possessions remained in the home, electrical service remained in place, it was unlikely Ronald would return to the house, and another person took care of the exterior of the home), *reh'g denied*, *trans. denied*; *Middleton v. State*, 181 Ind. App. 232, 391 N.E.2d 657, 661 (1979) (finding that a house was a dwelling where it had been burglarized while the owner was vacationing in Florida for approximately five months); 3 Wayne R. LaFave, *Substantive Criminal Law* § 21.1(c) (2d ed. 2003) ("If the place is one of human habitation, there is no requirement that a person be present therein at the time of the offense. If the residents are away, be it for a short time or for extended portions of the year, it will still suffice as a dwelling house." (footnotes omitted))). We found that it is reasonable to construe dwelling to include structures that have been occupied in the immediate past by a recently deceased resident and that this rule is consistent with the purpose of the burglary statute which is to provide an increased penalty for burglarizing a dwelling due to the potential danger to probable occupants. *Id*. at 550 (citation omitted). We also observed that, even

after the sole occupant of a house dies, it is common and expected for people still to be at the house. *Id*. at 547 (citation omitted).

[9] Further, we have observed that the term dwelling has been legislatively enlarged to afford protection to interests in the sanctity and security of habitation which, once established, do not necessarily fail because of the lack of use for purposes of sleep and that "a structure, once a dwelling, does not lose that character until such time as its inhabiter vacates the premises to the extent it no longer contains those accoutrements usual to the convenience of habitation." *Burwell v. State*, 517 N.E.2d 812, 814-815 (Ind. Ct. App. 1988), *reh'g denied*, *trans. denied*. *See also Ferrell v. State*, 565 N.E.2d 1070, 1072 (Ind. 1991) (observing that, while owner of the burglarized house was living with his girlfriend full-time, merely stored his furniture and clothes in his house while it was listed to be sold, and had not slept in his house for four months, the owner went to his house nearly every day to pick up his mail and occasionally would go inside for a few hours, and holding that the owner's furniture, appliances, and clothing in the house constituted accoutrements usual to the convenience of habitation and that the house had not lost its character as a dwelling).

[10] The record reveals that Garner's father lived at the residence in Gifford from 1984 until his death in August 2017. While he died approximately six months before the burglary and Danielle indicated the cameras had been installed because the house would be empty most of the time, the evidence supports the finding that the house continued to contain those accoutrements usual to the convenience of habitation. The residence had running water, electricity, an

operational furnace and stove, and a refrigerator, and Garner and his family were able to cook and did laundry there. When asked how often he visited the house since he inherited it, Garner stated "[w]e would try to go at least once a month, sometimes twice a month, depending on what we wanted to do." Transcript Volume 2 at 77. He also indicated he had been to the house "maybe a dozen times" after he inherited the house. *Id.* at 84. Danielle testified that the house was "kinda like a second home for us" and "[w]e try to go up once a month, or twice a month and spend the weekend there." *Id.* at 97. She also indicated that Garner's daughter visited the property "[p]robably about once a month as well." *Id.*

[11] As we observed in *Howell*, even after the sole occupant of a home dies, it is common and expected for people still to be at the house, *see* 53 N.E.3d at 547, which is what the evidence demonstrates occurred in this case. The finding that the home in Gifford was a dwelling is consistent with the purpose of the burglary statute to provide an increased penalty for burglarizing a dwelling due to the potential danger to probable occupants. The court instructed the jury regarding the definition of dwelling. The jury was able to consider the testimony elicited from Garner and Danielle, who were thoroughly cross-examined by Lovely's counsel. We will not assess the credibility of the witnesses or reweigh the evidence. *See Jordan*, 656 N.E.2d at 817. Based upon our review of the evidence, we conclude that the State presented evidence of a probative nature from which the jury could find beyond a reasonable doubt that he committed burglary of a dwelling as a level 4 felony.

## II.

[12] The next issue is whether his sentence is inappropriate in light of the nature of the offense and his character. He argues that his criminal history is comprised primarily of property and drug offenses, that he admitted to having attention deficit disorder, bipolar disorder, and substance abuse issues relating to heroin, methamphetamine and other narcotics, that the burglarized house was essentially vacant, and that, with his non-violent character and the present case being inextricably linked to his mental health and chemical dependence issues, the sentence imposed is inappropriate due to its failure to address the underlying issues. The State argues that his criminal history weighs heavy against his character, that he had seven prior felony convictions, and he has been charged with four burglary and six theft offenses.

[13] Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Ind. Code § 35-50-2-5.5 provides that a person who commits a level 4 felony shall be imprisoned for a fixed term of between two and twelve years with the advisory sentence being six years.

[14] Our review of the nature of the offense reveals that Lovely burglarized the home in Gifford and, although Garner's father had passed away approximately

six months earlier, Garner, Danielle, and Garner's daughter visited the house and slept there on occasion. Our review of the character of the offender reveals that, according to the presentence investigation report ("PSI"), his criminal history includes an adjudication as delinquent for trespass in 2006 and convictions as an adult for two counts of theft and possession of a controlled substance as class D felonies in 2009; aggravated unlawful use of weapon as a felony in Illinois in 2010; failure to return to lawful detention and failure to appear as class D felonies in 2011; possession of paraphernalia as a class A misdemeanor in 2016; and possession of methamphetamine as a level 6 felony in 2018. The PSI states that he has been previously charged with seven misdemeanor and twenty-two felony offenses. It states that he has a history of burglary and theft offenses including referrals as a juvenile as well as being charged with four burglary offenses and six theft offenses as an adult. The PSI further indicates he had two pending cases with active warrants. With respect to mental health, the PSI states that he claims he was diagnosed with attention deficit disorder, bipolar disorder, and depression and that he spent three to seven days at Wabash Valley Hospital in 2014 for mental health issues, and it states that he was diagnosed with impulse control disorder and intermittent explosive disorder. With respect to substance abuse, it states that he claims to have tried psychedelic mushrooms in 2015; first used marijuana at age sixteen and last used it in February 2018; reported to have used Hydrocodone, heroin, and methadone in the past; overdosed on heroin and methadone in February 2017 and was administered Narcan by police; first used methamphetamine in 2014 and claims he was under the influence of the drug during the commission

of the instant offense; and was court ordered to attend substance abuse counseling in another cause but never completed the program. The PSI also indicates that his overall risk assessment score places him in the high risk to reoffend category. After due consideration, we conclude that he has not sustained his burden of establishing that his sentence is inappropriate in light of the nature of the offense and his character.

[15] For the foregoing reasons, we affirm his conviction and sentence for burglary as a level 4 felony.

[16] Affirmed.

May, J., and Mathias, J., concur.